UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| MARIA BODOR, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No. 2:05-CV-268 |
| | ) | |
| TOWN OF LOWELL, INDIANA; | ) | |
| LOWELL, INDIANA POLICE CHIEF | ) | |
| DAVID WILSON; LOWELL, INDIANA | ) | |
| BUILDING ADMINISTRATOR, | ) | |
| WILLIAM GRECO; LOWELL TOWN | ) | |
| CODE ENFORCEMENT OFFICER; | ) | |
| LOWELL TOWN CLERK AND | ) | |
| EMPLOYEES, | ) | |
|     Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is presently before the Court on Defendants' Motion for Summary Judgment. [Doc. 33.] Plaintiff, Maria Bodor, brought this suit against the Town of Lowell, Indiana, Lowell Police Chief David Wilson, Lowell Building Administrator William Greco, Lowell Town Code Enforcement Officer, the Lowell Town Court Clerk and Employees under 42 U.S.C. § 1983, alleging that Defendants illegally entered and seized her property, harassed her for an extended period of time, and defamed her. For the reasons stated below, Defendants' Motion for Summary Judgment is **GRANTED**.

## Background

**A. Factual History**

The facts of this case paint a vivid picture of a near-decade long struggle between the Town of Lowell and Plaintiff, wherein the Town would ask Plaintiff to fix her property and Plaintiff would fail to do so. While tedious, these facts demonstrate why things are at the level

1

that they are today. Taking the facts in the light most favorable to the non-moving party, the facts underlying this dispute arose as follows:

Plaintiff's claims all arise from or relate to her ownership of a building located at 525 E. Main Street in Lowell, Indiana. This building is located in downtown Lowell, immediately adjacent to the Lowell Town Hall. Plaintiff has owned this building for more than a decade, and throughout the course of her ownership, the building has been deteriorating or in a state of disrepair. Plaintiff's building and property are zoned B-1, which does not allow for ordinary residential use; if Plaintiff wanted to use the building for residential purposes, she would have needed to obtain a special exception to the zoning ordinance.

Beginning in 1993 and extending into 2003, the Town began exchanging correspondence with Plaintiff and various other persons claiming to be the caretaker of the 525 E. Main St. property. Throughout the course of this decade-long dispute between Plaintiff and Defendants, Plaintiff apparently was known by several names or aliases, including Maria Bodor, Mary Boder, Mary Sullivan, Maria Sullivan, Reverend Toni Romano, and Kathy Ann Plesha. Similarly, the caretaker for Plaintiff's property was also known by several names or aliases, including Daniel Sullivan, Daniel Bodor, Arthur LaGrace, Arthur LaGace, Jim Lyles, and Daniel Romano.

The first set of correspondence, spanning from June to July 1993, includes a letter to Mr. "Daniel Sullivan," a representative for Trinity Unification Church, from Mr. Richard Harrison, the Building Administrator for the Town of Lowell, informing him of the need for a Special Exception to the zoning if the building is to be used for residential purposes. In the letter, Mr. Harrison directed Mr. Sullivan to contact him within five days to resolve the matter. Mr. Sullivan replied to this letter and informed Mr. Harrison that the building was used only for

2

storage and that it was rarely visited.  Mr. Sullivan further indicated that the Trinity Unification Church had decided to sell the building because it was unsuitable for the church's purposes.

The next correspondence came over three years later.  On November 26, 1996, Lowell Building Administrator Bob Balczo sent a missive to Plaintiff indicating that the condition of the 525 E. Main Street building was in disrepair and that if no action was taken by Plaintiff, the building could be declared a public nuisance and Plaintiff could be issued an Order to Repair by the town.  This letter further indicated that the use of the building was in question and again reiterated the potential need for a special use permit for the property.

Five months later, Plaintiff replied to the letter with a lengthy handwritten response.  She indicated that Mr. Balczo's letter had been forwarded to her building's caretaker, "John Lyles," and she had discussed repairs with him that were allegedly underway.  She even outlined several repairs that she asserted had been made and repairs that were in progress and/or planned.  Further, she indicated that the building was under a "sales proposal" that required the repairs to be completed and she also requested that a roofing permit application be forwarded to her.

On May 12, 1997, Mr. Balczo responded to Plaintiff's request for a permit, forwarding her the permit application as well as informing her that the fire department was required to inspect the premises.  Further, in this letter, Plaintiff was informed that shingles were falling from her building and onto surrounding properties, including Lowell's Town Hall.  Mr. Balczo also informed Plaintiff that the police department had been notified and that citations could be issued for this violation.

Approximately one month later, on June 11, 1997, Mr. Balczo sent a follow up letter to Plaintiff, indicating that her request for a permit for roofing repairs had never been received.  He indicated that Plaintiff had also failed to complete the repairs which were promised in her April

3

30 letter, and he further noted that the building was continuing to deteriorate.  Mr. Balczo also informed Plaintiff that the matter had been turned over to the Town Attorney, that this was her official notice of violation, and that she had seven days to respond to the notice.

On June 25, 1997, Mr. Balzco again wrote to Plaintiff and informed her that she needed to come to his office to obtain a permit.  He further urged Plaintiff to contact the building office as soon as possible so that the town could confirm that the repairs were being done consistent with state and municipal codes.  Plaintiff was reminded that the issue had already been turned over to the town attorney for review.

After his follow up contacts by phone and certified mail failed, Mr. Balczo sent another letter to Plaintiff on August 26, 1997.  The statements in the letter make it apparent that repairs had commenced on the roof, but that Plaintiff had not yet properly obtained a permit for the roof work from Town Hall.  In the letter, Plaintiff was informed that she was in violation of §§ 17.26.035 and 17.36.050 of Lowell's Town Code and that in order to avoid prosecution, she needed to appear in person to Town Hall to pay her fees and pick up her permit.

It was more than a year later, on December 8, 1998, before the Town again tried to contact Plaintiff regarding the ongoing violations of the building code. The Town's December 8, 1998, correspondence articulated three specific violations that had to be remedied immediately.  Plaintiff was provided a deadline of December 14, 1998, to contact the office to avoid any fines for the violations.  Accompanying the letter was a zoning violation notice posted on the door to the building, indicating that code §50.07 was violated, which included "garbage/broken windows."   The violation notice provided Plaintiff until December 9, 1998, to make the repairs.

On December 13, 1998, Plaintiff sent a hand-written response to the  Mr. Balczo's December 8 correspondence.  Plaintiff indicated that she had received his letter from her

4

caretaker, "Jim Lyles," and that she had instructed Mr. Lyles to remedy the problems identified in Mr. Balczo's letter. Plaintiff represented that she was having some personal and financial difficulties that were, in part, responsible for the condition of the building, but she again promised to take measures to ensure that further violations did not occur. Once again, Plaintiff articulated planned repairs and her future intent to re-visit the property in February 1999 to inspect these repairs, at which time she promised to contact the Fire Marshall to comply with the annual inspection. In this letter, Plaintiff informed Mr. Balczo that she intended to use the building for a "Holiday/Christmas Museum." Finally, she indicated that Mr. Lyles, who resided and worked in Chicago, would be visiting the property three to four days per week to oversee the property and its repairs.

On July 7, 1999, Mr. Balczo again sent a letter to Plaintiff indicating numerous problems with the building, including broken windows, the poor condition of the roof, and the improper use of the building as living quarters. The letter details the many attempts to contact Plaintiff, and addresses the immediate need to discuss the condition of the building with her, going so far as to suggest that she "maybe walk next door and visit this department." Finally, the letter states that "failure to comply with this order will result in the maximum fine being levied."

On July 9, 1999, "Jim Lyles," the asserted caretaker of the building, forwarded a hand-written letter to Mr. Balczo indicating that repairs were underway. He indicated that Plaintiff was experiencing financial difficulties which caused the delay in the repairs, but that monies were now available for him to make the necessary repairs. Further, this letter indicated that Plaintiff had contacted the National Historical Trust for grant consideration and that research had been completed as to the original appearance of the building for purposes of restorations. The letter flatly denies that any persons were living in the building. Mr. Lyles also explained that on

5

the occasions when he would visit the building, his dogs would accompany him; however, he assured Mr. Balczo that the dogs resided in Illinois and left with him every evening. Finally, he indicated that Plaintiff was "looking forward to meeting" Mr. Balczo and his staff as she intended to visit the building in the near future.

Ten days after Mr. Lyles' communication, the Town of Lowell issued an ordinance violation for "broken windows and missing window coverings" at the 525 E. Main St. building. This citation, issued by Mr. Balczo, indicated a violation of §111.03, penalty §10.00, which carried a maximum fine of $25.00, which each day constituting a separate offense.

In an undated letter to Mr. Balczo, presumably following the issuance of this citation, Mr. Lyles again indicates that he is making repairs as requested, but cites to weather difficulties as his excuse for not completing the repairs. Additionally, Mr. Lyles indicated that certain window frames had been sent out for repair and would be replaced within a week.

On August 10, a violation was issued to Plaintiff for violations of §90.01 (presence of "junk vehicles" on property) that could result in a daily fine between $50-$1,000 per day. Then, on August 16, 1999, Plaintiff was sent another violation for the same offense, namely, "junk vehicles" in violation of Lowell Municipal Code §90.01. On September 3, 1999, Plaintiff was issued yet another citation for "junk vehicles" in violation of the same code section.

The next citation issued to Plaintiff came in January 2000, this time for placement of a dumpster on the sidewalk. A notation on the submitted evidence indicates that this violation was remedied on January 14, 2000.

On May 12, 2000, the Town of Lowell issued two more citations to Plaintiff, one for "high weeds" in violation of Lowell Municipal Code §96.01, and another for "junk cars" in violation of §90.01. Plaintiff entered a plea of guilty to these violations, indicating that she was

6

now in compliance with both code sections and paying $50 fines for each violation. Further, Plaintiff specifically indicated that outside repairs would begin the first week of June and that the outside equipment would be removed within a week.

On May 25, 2000, Mr. Lyles wrote to Mr. Balzco informing him of the intent to commence repairs over "Memorial Weekend (weather permitting)." Additionally, Mr. Lyles indicated that certain repairs had been completed. In response to this, on May 26, 2000, Mr. Balzco responded with two door tags which stated that in his opinion, "the roof is not safe or structurally sound" and indicated that his repeated requests to inspect the premises had been denied. Further, Mr. Balzco indicated that "I get the same message every year. If repairs are not made immediately, this matter will be turned over to the town attorney for prosecution under the unsafe building code."

The next communication regarding the building came from Mr. Lyles on October 9, 2000. This letter indicates that Mr. Lyles had been working on the roof and that after November 1, 2000, he would have more time to devote to the building, as he was retiring.

On November 13, 2000, Code Enforcement Officer John Clark issued two citations to Plaintiff for "junk vehicles" on her property in violation of Lowell Municipal Code §90.01. Mr. Lyles replied with a four page hand-written letter which, amongst other things, called into question the propriety of the citations. Mr. Lyles expressed in this letter the bewilderment of both himself and Plaintiff at the citation, because the vehicles were allegedly in running condition and were not unsightly. Mr. Lyles requested that copies of the citations be sent to Plaintiff along with a copy of the violated ordinances so that she could contest the citation in court. Finally, Mr. Lyles indicated that "the roof will be done this year" and that the vehicles

will be removed by January 31, 2001. Plaintiff ultimately paid the costs for the violations on March 28, 2001.

The next correspondence with Plaintiff regarding the property occurred on August 15, 2001, again citing Plaintiff for "high weeds" at her building. A notation on the letter, though, indicates that the problem was remedied on August 17, 2001.

On July 3, 2002, new Building Administrator Bill Greco wrote to the Lowell Town Counsel asking for input on what to do about 525 E. Main St. This memorandum indicated that after review of the file, Mr. Greco noted that "we have been dealing with this problem for some time." He also indicated that he spoke with a person at the property, and that this person expressed that the building was being converted into a Christmas Museum. The same day as this memorandum, Mr. Greco sent a letter to Plaintiff, indicating that Mr. Greco had spoken with a woman at 525 E. Main St. in regards to the expired building permit and that an inspection of the building was necessary. Mr. Greco expressed a desire to set up an appointment for an inspection and requested that Plaintiff contact him before July 12, 2002.

Apparently, Plaintiff failed to contact Mr. Greco by the designated date, as on July 12, 2002, Mr. Greco issued a citation to Plaintiff for failing to renew the expired building permit pursuant to Lowell Municpal/Zoning Code §155.124B. A notation on this document indicates that the $50.00 fee was paid on July 19, 2002.

On November 20, 2002, Mr. Greco sent a letter to Plaintiff to address several issues regarding the building. Mr. Greco referenced Mr. Sullivan's earlier promises that the chimney was being repaired and that a walk-through would be scheduled following Plaintiff's return from caring for her ill mother. As of November 20, 2002, Plaintiff still had not completed the repairs or scheduled an inspection. Mr. Greco indicated that in light of the known roof problems and the

8

open windows exposing the structure to the elements, he was making a formal request for inspection in order to determine if the building was structurally sound.  Further, Mr. Greco threatened that if Plaintiff did not comply with this request, he would seek an inspection warrant through the courts.  Mr. Greco enclosed the appropriate ordinances with the letter for Plaintiff's review.

Mr. Lyles responded to Mr. Greco's letter on November 24, 2002.  In his five-page handwritten letter, Mr. Lyles claimed that Plaintiff was in the process of completing work on the building and that she would soon be telephoning Mr. Greco regarding his letter.  Consistent with the earlier letters, Mr. Lyles provided excuses as to why he could not complete some of the repairs on the house.  According to the letter, Plaintiff had visited the premises with a building inspector from an insurance carrier, and she was told that the roof needed to be repaired, but that there were "no significant structural problems or safety considerations other than the north chimney…and possible future damage to roof…if the roof and flashing aren't attended to."  Finally, Mr. Lyles indicated that it is possible that Plaintiff might raze the building if she decides to use another building for her museum.

Matters began to escalate in January 2003 regarding the condition of the building.  On January 2, 2003, Mr. Greco prepared an Affidavit for Issuance of Administrative Inspection Warrant.  In this affidavit, Mr. Greco indicates that "[a]ppointment for inspection had been made by owner for 12/26/02, confirmed by owner to be 12/27/02, cancelled by owner 12/26 02, due to taking mother to Mayo Clinic."  The affidavit referenced a letter of November 20, 2002, which cited the "poor condition of the chimney and roof, missing or damaged windows, scaffolding and

9

ladders left on or around building [and the existence of b]uilding materials stored around outside of building."

Pursuant to this affidavit, on January 7, 2003 at 3:30 PM, Lowell Town Judge Thomas Vanes issued an Administrative Inspection Warrant for Entry Upon Property and Premises. The warrant was executed on January 8, 2003 at 1:00 PM and returned at 11:30 AM on January 9, 2003. When the warrant was executed, town officials found more problems than expected.

During his execution of the warrant, Chief Wilson forced the door open after a woman claiming to be "Mary Sullivan" attempted to bar his entry. After Chief Wilson read the warrant to her, the woman began to hyperventilate and Officer Swisher, an EMT who accompanied Chief Wilson, examined her until the ambulance could respond. After being tended to by ambulance personnel, she signed a release and returned to the building, while, at the same time, a male subject identifying himself as "Dan Sullivan" came from the east side of the building.

Chief Wilson entered the building to ascertain whether it was safe for other Town personnel to enter for the inspection. According to his report, he found that the building was filled with trash, smelled badly, and access to many parts of the house were impeded by piles of debris. Additionally, there were cages and animals scattered throughout the building, with animal food and feces lying around the rooms. Some rooms were wired closed and contained upwards of ten cats in each, while other rooms were closed off with dogs inside. Outside, a van apparently served as a kennel, where a dog was apparently fed through a window, and there was approximately eight inches of waste in the floor of the van. More disturbingly, some areas of the building evidenced blood from either deceased or injured animals. Chief Wilson noted that it appeared as if some of the animals had been feeding on others.

10

Once other employees entered, it was found that there was running water in the building, the employees concluded that the parties identifying themselves as "Dan and Mary Sullivan" were living in the building, as evidenced by the presence of a bed, clothing, food, dishes, chairs, and a television.  Further, part of the ceiling in the south east upstairs corner was beginning to collapse, amongst other structural damages noted.

Following the search of her property, a criminal action was instituted against Plaintiff, culminating in a trial on April 8, 2004.  Following the presentation of evidence at the trial, the Lowell Town Court found that Plaintiff violated numerous sections of the Town of Lowell's Code of Ordinances including § 155.004 (maintenance of kennel); § 156.06 (public nuisance); § 156.11 (exterior maintenance); § 156.12 (rubbish and disposal of garbage); § 156.14 (stairway obstruction and interior walls); § 156.18 (electrical systems); and § 156.21 (combustibles and fire resistant ratings). The court specifically noted that the nuisance condition created by Plaintiff's property spanned from the date of the original violation through the date of trial, for a total of 446 days.  The court further noted that the record was completely devoid of any evidence demonstrating that Plaintiff undertook any remedial efforts to remedy the violations at her property.  Finally, the court noted that Plaintiff attempted to avoid the terms of her earlier deferral agreement with the town by selling her property to "Dan Sullivan."   Based on these violations, the court fined Plaintiff for a total of $52,134.00.

In her Response to Defendants' Motion for Summary Judgment, Plaintiff included affidavits from "Arthur LaGace" and "Frank LaGace."  To the extent that any of the testimony offered in these affidavits was relevant to Plaintiff's claims (the majority are not), the Court included this evidence in the factual recitation above.  However, the remaining exhibits attached to Plaintiff's Response cannot be considered for purposes of the present motion for summary

11

judgment because the proffered evidence is not admissible, due to lack of authentication and foundation.

Plaintiff filed her initial complaint on January 7, 2005, alleging that Defendants, on January 8th, 2003, violated her federal civil rights. The matter is now before the Court on Defendants' Motion for Summary Judgment.

## Analysis

**A.    Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment. The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby*, 447 U.S. 242, 252 (1986). A genuine dispute about material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Although this Court will construe all evidence in a light most favorable to the nonmovant when deciding summary judgment, this Court cannot consider evidentiary materials that are not properly before it. *Averhart v. Arrendondo*, 773 F.2d 919 (7th Cir. 1985). The Court simply cannot overlook the requirements of the federal rules of evidence or civil procedure, especially the requirements set for in Federal Rule 56(e), when evaluating a pro se plaintiff's materials filed

in opposition to a motion for summary judgment. *Id.* It is for this precise reason that the Court advised Plaintiff of her obligations when responding to Defendants' Motion for Summary Judgment. [*See* Doc. 39.]

### B. Plaintiff's Claims Brought Pursuant to 42 U.S.C. § 1983

Plaintiff's claims against Defendants are frustratingly vague, thereby making it extremely difficult for the Court to discern the legal and factual bases for these claims. What is even more disappointing – and what has made the analysis of this case even more vexing – is that Defendants' briefing in support of its Motion for Summary Judgment does not provide much more clarity, so it appears that the Court is left to its own devices. That being said, despite the somewhat convoluted record before this Court, it appears that the majority of Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983. Unfortunately, the specific constitutional or statutory violations upon which Plaintiff bases her § 1983 claims are a bit more murky, but it appears that Plaintiff is essentially asserting a claim for violation of her Fourth Amendment rights, a claim for harassment, and a state law claim for defamation.

To recover under § 1983, Plaintiff must prove that Defendants deprived her of a federal right while acting under color of state law. 42 U.S.C. § 1983; *see Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Here, it is uncontested that all Defendants were acting under the color of state law, so the first step in the present analysis is to determine whether Plaintiff had a constitutionally or statutorily protected right at stake. Plaintiff cannot withstand summary judgment if she is unable to specifically articulate a right that has been violated. *Parrot v. Taylor*, 451 U.S. 527, 529 (1981). As previously stated, it appears that Plaintiff is bringing a

13

claims under 42 U.S.C. § 1983 for (1) the unreasonable search and seizure of her property, and (2) harassment. These claims will be addressed in turn, below.[1]

### 1.  Fourth Amendment Violations

Plaintiff's Fourth Amendment claims against Defendants are based on the January 8, 2003, search and seizure of her 525 E. Main Street property. Plaintiff contends that the search and seizure of her property was unreasonable because Defendants conducted the search with an invalid administrative warrant. The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." *Id.* A private property may not be entered to conduct a search or effect a seizure without a warrant, and this protection has been extended to unreasonable searches and seizures of property in the civil context. *Soldal v. Cook County, Ill.*, 506 U.S. 56 (1992). Plaintiff's interest in her building clearly qualifies as protected "property" under the Fourth Amendment, *Pepper v. Village of Oak Park*, 430 F.3d 805, 808 -809 (7th Cir. 2005), so this Court must analyze whether Defendants' search and temporary seizure of Plaintiff's building was unreasonable.

It is uncontested that the Town of Lowell clearly had an interest in ensuring that the buildings located within its jurisdiction are properly maintained and constructed. *See, e.g., Devines v. Maier*, 728 F.2d 876 (7th Cir. 1984) (cities have a regulatory duty to protect the health and safety of their citizens, which includes the enforcement of building codes). In this case,

---

[1] As mentioned above, Plaintiff was prosecuted for the violations that arose out of the execution of the inspection warrant. Nevertheless, the Defendants do not argue, and therefore we do not address, whether Plaintiff's § 1983 claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

Defendants have presented this Court with an Affidavit for Issuance of Administrative Inspection Warrant signed by William Greco on January 2, 2003 and an Administrative Inspection Warrant signed by Judge Vanes on January 7, 2003.  The threshold issue in this analysis is whether the warrant was properly issued.

The warrant requirement applies in both the administrative and criminal context, but administrative inspections and searches are treated differently under the Fourth Amendment "because of the lesser intrusion usually involved." *Montville v. Lewis*, 87 F.3d 900, 903 (1996). For this reason, administrative warrants do not require the same kind of probable cause required for a criminal search; *Id.* (citing *O'Connor v. Ortega*, 480 U.S. 709 (1987)), instead, probable cause supports an administrative order if the warrant application supports a "reasonable belief" or "leads to a reasonable suspicion" that a regulatory violation is present. *See generally Matter of Midwest Instruments Co.,* 900 F.2d 1150, 1153 (7th Cir. 1990).  Administrative warrants are proper "if there is a showing that reasonable legislative or administrative standards for conducting an inspection are satisfied." *Montville*, 87 F.3d at 903.

Under Indiana's Inspection Warrants statute, I.C. 36-7-9-16(b), if an owner of a structure or building refuses inspection, the inspection officer may obtain an inspection warrant in order to determine if the building is unsafe. *Id.*  Under the Inspection Warrant statute, the person seeking the warrant must show that probable cause exists to believe the building is in an unsafe condition justifying the search. *Id.*

In Mr. Greco's probable cause affidavit, he testified that the chimney and roof on the building at 525 E. Main St. were in poor condition.  Mr. Greco further testified that there were missing or damaged windows and other various debris at or around the building.  Mr. Greco testified that an appointment for inspection had been scheduled for December 26, 2002, with

15

Plaintiff, but she cancelled this appointment because she had to take her mother to the Mayo Clinic.  Based on this affidavit, Lowell Town Court Judge Thomas Vanes ordered an Administrative Inspection Warrant on January 7, 2003, at 3:30 p.m.  Based on this Court's review of the facts of this case and the testimony provided in Mr. Greco's affidavit, Judge Vanes' decision to issue the Administrative Inspection Warrant was clearly based on probable cause.  There can be no doubt that the affidavit allowed Judge Vanes to form a "reasonable belief" or "reasonable suspicion" that a regulatory violation was present at the building.  *See Midwest instruments Co.*, 900 F.2d at 1153.  As such, this Court finds no Fourth Amendment violation with respect to the issuance of the warrant.

The Court can also dispose of Plaintiff's additional complaint that the warrant was "stale" at the time of execution.  Plaintiff claims that the Administrative Inspection Warrant presented in Defendants' Motion for Summary Judgment is a forgery and that the warrant which was actually signed by Judge Vanes for the search of Plaintiff's property was signed on January 6 (not January 7).  Accordingly, Plaintiff contends that the warrant was executed more than 24 hours after the expiration of the warrant.  The only "evidence" that Plaintiff has provided to this Court to support her claim is a copy of the warrant originally submitted by the Defendants, but containing handwritten notes indicating that the document's signatures were "forged."[2]

---

[2]After reviewing all of the materials filed by Plaintiff throughout the course of this action, this Court did find a copy of an administrative inspection warrant which Plaintiff apparently contends is the actual warrant that was issued for her property. [Doc. 41, Ex. A.] Plaintiff did not attach this document to her Response to the motion nor did she properly refer to the document in her Rule 56.1 Response.  Nonetheless, even if this document was properly before the Court, the document does not support Plaintiff's claim that the search warrant executed by Judge Vanes on January 7, 2007, was a forgery.  The administrative inspection report referred to by Plaintiff appears to have been executed on January 6, 2003, but the warrant does not identify the property to which it applies, the date of the execution of the warrant, or the date of the return of the warrant.  Simply put, Plaintiff's version of the warrant is blank, with the

16

Plaintiff's handwritten statements on the affidavit, though, do not constitute "evidence" that is properly before the Court, so this Court cannot consider Plaintiff's version of the warrants. *See, generally, Pfeil v. Rogers*, 757 F.2d 850 (7th Cir. 1985) (unsworn documents or unsworn affidavits cannot be considered in summary judgment proceedings); *Mays v. Rhodes*, 255 F.3d 644 (8th Cir. 2001) (unsworn, handwritten statements were not admissible evidence for purposes of summary judgment motion).

Accordingly, the evidence before this Court establishes that the administrative inspection warrant was issued on January 7, 2003, was timely executed on January 8, 2003, and was timely returned on January 9, 2003. Because the warrant was properly executed and returned, Plaintiff's Fourth Amendment claim fails.

        **2.**        **Harassment**

Plaintiff also claims that Defendants harassed her by trying to force her to sell the 525 E. Main St. property, by refusing to issue her permits, by issuing citations for building violations to her while she owned the property, and by issuing citations for building violations after she sold the property. Simple harassment, though, without more, is not actionable under § 1983. *Bacon v. Patera*, 772 F.2d 259 (6th Cir. 1985). While such conduct may be unprofessional, it simply does not rise to the level of a constitutional claim. *Harris v. City of West Chicago, Illinois*, 2002 WL 31001888 (N.D.Ill. 2002). Here, Plaintiff has not pointed to and this Court has not found any constitutional claims associated with Plaintiff's vague allegations that she was harassed by

---

exception of a signature by Judge Vanes on January 6, 2003. There is no evidence before this Court which would support Plaintiff's contention that her version of the warrant, and not the version of the warrant submitted by Defendants (signed by Judge Vanes on January 7, 2003), was the actual warrant which allowed Defendants to search her property.

Defendants. Without an accompanying constitutional or statutory claim, Plaintiff's claim under §1983 is not actionable and therefore fails.

### C. Plaintiff's State Law Claim of Defamation

Plaintiff's only remaining claim appears to be directed at Police Chief Wilson, individually. She contends that her "civil rights were violated constantly by Chief Wilson falsely informing media and community of Plaintiff's connection with felines in [her] building and clutter." [Doc. 53 at p. 4.] Plaintiff's defamation claim fails for several reasons.

First, Police Chief Wilson is immune to this claim under the Indiana Torts Claims Act ("ITCA"), Indiana Code § 34-13-3-3. The issue of immunity is a question of law, reserved for the Courts. *Miller v. City of Anderson*, 777 N.E.2d 1100 (Ind.Ct.App. 2002). Two issues must be met before a governmental employee is entitled to immunity from state law tort claims: first, the governmental employee, or in this case, Police Chief Wilson, was acting within the scope of his employment, and second, Plaintiff's loss occurred as a result of Police Chief Wilson's performance of his discretionary functions or law enforcement activities. I.C. § 34-13-3-3(7)-(8)*; see also Miller*, 777 N.E.2d at 1104. Based on the record evidence before this Court on the present motion for summary judgment, there is no question that Police Chief Wilson was acting within the scope of his employment at the time of the alleged incidents. Further, any losses suffered by Plaintiff as a result of Police Chief Wilson's conduct was plainly the result of him participating in his discretionary and law enforcement activities. Thus, Police Chief Wilson is afforded immunity under the ITCA and Plaintiff's defamation claim fails.

Second, even if Police Chief Wilson was not entitled to immunity under the ITCA, Plaintiff's claim for defamation would nonetheless fail. There must be a false statement of fact in order to impose liability for defamation. *Conwell v. Beatty*, 667 N.E.2d 768 (Ind.Ct.App.

1996).  Defendants presented this Court with an affidavit from Chief Police Wilson, as well as his report of the findings made during his search of Plaintiff's property.  These statements are uncontradicted by any competent evidence provided by Plaintiff in her Response to the motion for summary judgment.  Because this Court has no indication that any of Police Chief Wilson's statements were false, all statements shall be taken as truthful for purposes of this motion, thereby barring Plaintiff's claim for defamation.  *See, e.g., Gatto v. St. Richard School, Inc.*, 774 N.E.2d 914 (Ind.Ct.App. 2002) (truth functions as an absolute bar to recovery for defamation).

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. 33] is hereby **GRANTED.**  In light of this order, Defendants' Motion to Strike [Doc. 54] is **DENIED** as moot.  The clerk shall **ENTER FINAL JUDGMENT** in favor of Defendants Town of Lowell, Indiana, Lowell Police Chief David Wilson, Lowell Building Administrator William Greco, Lowell Town Code Enforcement Officer, the Lowell Town Court Clerk and Employees, and against Plaintiff Maria Bodor. The clerk shall treat this civil action as **TERMINATED**.  All pending dates in this case are **VACATED.**

    **SO ORDERED.**

    **ENTERED:** March 28, 2007

                                                              s/ Philip P. Simon
                                                              PHILIP P. SIMON, JUDGE
                                                             UNITED STATES DISTRICT COURT